UNITED STATES of America, Appellee,

v.

Salvador RAMOS, Appellant.

UNITED STATES of America, Appellee,

v.

Servando RAMOS, Appellant.

Nos. 93–2726, 93–2739.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1994.

Decided Dec. 7, 1994.

Michael J. Burdette, Des Moines, IA, argued, for Salvador Ramos.

Chip J. Lowe, Des Moines, IA, argued, for Servando Ramos.

Edwin F. Kelly, Des Moines, IA, argued, for U.S.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge, and JACKSON,* District Judge.

* The Hon. Carol E. Jackson, United States District Judge for the Eastern District of Missouri, sitting by designation.

RICHARD S. ARNOLD, Chief Judge.

Servando and Salvador Ramos appeal the District Court's[1] refusal to suppress evidence seized during a search of Salvador's truck. The Ramos brothers argue that the police did not have probable cause to search their truck, and that the consent given by Salvador to search the truck was not knowing or voluntary. After hearing argument, we filed an opinion reversing the judgment, one judge dissenting. 20 F.3d 348 (8th Cir. 1994). We then granted the United States' petition for rehearing and restored the case to the calendar for reargument. We now hold that the District Court's finding of consent is not clearly erroneous, and therefore affirm.

I.

Early one August morning in Scott County, Iowa, brothers Salvador and Servando Ramos were driving their truck east on Interstate 80. Trooper Brian Abernathy had positioned himself at a crossover when he spotted a truck with a Texas license plate carrying a passenger, Servando, not wearing his seat belt. The trooper followed the truck to make sure he was right and then pulled it over. The trooper asked for both Salvador's and Servando's driver's licenses and asked Salvador, who had been driving the truck, to come back to his patrol car while he ran checks on both licenses. Neither of the two appeared nervous, and both cooperated with the trooper.

While checking the licenses, Trooper Abernathy engaged Salvador in some conversation, asking him about his employment, where they were going, and where they were coming from. Salvador told the trooper that they were driving to Chicago to see a sick cousin. When Trooper Abernathy asked Salvador what part of Chicago they were going to, Salvador did not know.

After the checks on their licenses and the truck came back clear, the trooper gave Salvador his license back and asked him to remain in the patrol car while he gave Ser-

1. The Hon. Charles R. Wolle, Chief Judge, United States District Court for the Southern District of Iowa.

vando a warning.[2] He wanted Salvador to stay in the patrol car because he wanted to continue asking Salvador more questions. Trooper Abernathy went up to the truck, gave Servando his warning, and asked Servando where they were going. To this question Servando also told the trooper that they were going to Chicago to visit a sick cousin. Even though the brothers' answers were consistent, the trooper returned to his patrol car and asked Salvador whether they had any guns or drugs because "it's a known fact that drugs and weapons are being transported across the interstate." (Suppression Hearing p. 54.) Salvador answered no, and the trooper then asked for permission to search the truck.

When Salvador told Abernathy he could search, the trooper pulled out a bilingual (English and Spanish) "Consent to Search" form. He advised Salvador that he did not have to consent, filled out one side of the form, and asked Salvador to sign it. Salvador did so, and Trooper Abernathy called for back-up to assist in the search. When the back-up arrived, Servando was asked to stand behind the truck, and Salvador joined him.

At first Trooper Abernathy found only medical supplies consistent with Servando's infirmities. Then he looked in the driver's side map pouch and found a .45 caliber bullet. He also noticed an old pair of boots behind the driver's seat, and in one of the boots there was a brown paper sack with more bullets. The trooper then asked Salvador if there was a gun in the truck; Salvador said that he was not sure. Trooper Abernathy went back to the truck, looked in the other boot, and found a handgun.

Trooper Abernathy noticed there was some spot welding at the seams of the fuel tank, which made him wonder whether the tank could hold fluid. He began to inspect the tank and noticed details suggesting the tank was not being used for diesel. Residue usually associated with diesel was not there,

and there was visible rust in the filler tubes of the tank.

Abernathy asked Salvador to drive the truck to a nearby service station for a closer mechanical inspection. Salvador agreed, and the trooper had the station notified that they would be coming. While he was radioing in, the brothers talked to each other in Spanish and then told the troopers that they would find 150 pounds of marijuana in their tank. The brothers claimed they were carrying the pot to Chicago for a Texas state narcotics officer and showed the troopers an old Texas state narcotics business card. The truck was taken to the station, and after the Ramos brothers showed them how to get into the false tank, the police found 159 pounds of marijuana.

After a suppression hearing, the District Court found that the traffic stop was valid, that the questions the trooper asked were not intrusive, and that the trooper had sufficient reason (foreign plates, uncertainty about what part of Chicago they were going to) to ask whether the Ramoses were carrying guns or drugs and to request permission to search the truck. The Court also expressly found the consent to search was voluntary. The Ramoses appeal these findings and the Court's denial of their motion to suppress the evidence.

## II.

The Ramos brothers first argue that the scope of the questioning was not reasonably related to the circumstances that justified the stop, and therefore the fruits of the search should be suppressed. See *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir.1990), cert. denied, —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991).

Trooper Abernathy stopped the truck after he observed Servando not wearing his seat belt. This is a legitimate reason for a stop, and our review of the record does not reveal clear error in the District Court's credibility determination or findings of fact regarding the traffic violation. See *United States v.*

2. Trooper Abernathy gave Servando a warning rather than a ticket. Although there was a violation of the seat-belt laws, it is within the officer's discretion whether or not to give a ticket. Ser-

vando had a good reason for not wearing a seat belt—it would have gotten in the way of the colostomy bag he was wearing.

*Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994). We conclude, therefore, that this stop was initially permissible.

■ After stopping the truck, the trooper could ask any questions reasonably related to the stop. *Cummins,* 920 F.2d at 502. Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993); *United States v. Richards,* 967 F.2d 1189, 1192–93 (8th Cir.1992). Here, of course, there was no violation by the driver, but we assume for purposes of this appeal that it was lawful for the trooper to question him in a routine manner.

If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop.

■ Abernathy asked for Servando's and Salvador's drivers' licenses, and he asked both men where they were going. Both of the brothers gave the trooper their licenses, and both answered that they were going to Chicago to visit a sick cousin. The license check came back clear, and both brothers answered the trooper's questions consistently. The Ramos brothers were cooperative, their licenses were clean, the truck was not stolen, their answers about their destination were consistent, and Servando had a reason for not wearing his seat belt—a colostomy bag.

On this record, the District Court held that the officer had a sufficient objective basis under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to question Salvador Ramos further. The Court relied on the facts that the vehicle was on an interstate highway with out-of-state plates, and that Salvador and Servando were not certain about the part of Chicago that was their destination. We respectfully disagree with this conclusion. All of these facts were consistent with innocent behavior. Of course, that is not in itself sufficient to negative the existence of reasonable articulable suspicion under *Terry.* A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity, that further inquiry is appropriate. In the present case, though, the collection of circumstances relied on is simply insufficient. We so held in the panel opinion, and it is not necessary to repeat here the reasons that were explained at that time.

The District Court, however, went on to articulate another, independent basis for its decision to deny the motion to suppress.[3] The Court said:

> In any event, it is plain to me that it was reasonable for the officer to request permission to search the pickup. Salvador understood all of the English spoken by the officers that day.... When the request was made, Salvador plainly understood that he didn't have to give the permission. He voluntarily consented. From that point on, everything that was done was with the consent of the defendants.

None of these findings of fact is clearly erroneous. All of them are well supported in this record. Trooper Abernathy testified that after his conversation with Salvador, he returned his driver's license. He told Salvador that "he did not have to let me search his vehicle—and he wanted to let me search his vehicle—that I needed him to sign on the line." Motion Tr. 20. In addition, the consent form, which was in both English and Spanish, itself stated that there was no obligation to sign. Salvador testified that his license had not yet been returned at the time

---

3. This is the point on which the writer of this opinion has changed his mind since the filing of the panel opinion. After reading the United States' petition for rehearing, I concluded that the issue of consent should receive more attention. After studying the transcript of the hearing on the motion to suppress, I voted to grant the rehearing petition, and now, after reargument, I have become convinced, for reasons stated in the text, that our previous opinion was mistaken on the question of consent.

that he signed the form, and that the trooper never told him he had a right not to agree to the search, but the trier of fact of course was not required to believe this. The District Court was free to believe Trooper Abernathy, and it obviously did so.

As we understand the Supreme Court's cases, statements that result from an illegal detention are not admissible. See *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We take it that this rule would apply as well to physical evidence discovered during or as a result of an illegal detention. It is possible, however, for the causal chain between an illegal arrest and evidence discovered afterwards to be broken. With respect to a statement, for example, this requirement is met if the statement is "sufficiently an act of free will to purge the primary taint." *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416–17. The giving of *Miranda* warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility. *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). There is no *per se* rule that *Miranda* warnings "always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Id.* at 603, 95 S.Ct. at 2261. On the other hand, the Court has not adopted "any alternative *per se* or 'but for' rule." *Ibid.* Rather, the facts of each case must be carefully weighed:

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive.... The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Id.* at 603–04, 95 S.Ct. at 2261–62 (footnotes omitted).

In the present case, for reasons we have explained, we believe that continuing to detain the defendants after their licenses and registration had been checked was a violation of the Fourth Amendment. We assume for present purposes that Salvador did not feel free to leave even after his driver's license had been handed back to him, and that this feeling on his part was reasonable under all the circumstances. We think it clear that his written consent was a result of the illegal detention in a "but for" sense. If the illegal detention had never taken place, if he had been sent on his way after the document check had been properly concluded, the subsequent conversation, including the offering of the consent form, would not have occurred. But, under *Brown v. Illinois, supra,* that is not the end of the matter. The further question is whether Salvador's consent, found to be voluntary by the District Court, was "sufficiently an act of free will to purge the primary taint." *Wong Sun, supra,* 371 U.S. at 486, 83 S.Ct. at 416–17. On this record, we think the answer is yes. The officer told Salvador, both orally and in writing, that he did not have to sign the consent form. Such a warning is not required by law, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and so the fact that the officer gave it indicates rather strongly to us that he was not attempting to exploit an illegal situation. The arrest and consent were close in time, and there were no intervening circumstances, but the officer's conduct was in good faith, and the violation of *Terry* was not flagrant. What happened here, really, went beyond voluntary consent. It was an affirmative waiver of Salvador Ramos's Fourth Amendment right to prevent a search of his vehicle.

Accordingly, we hold that Salvador Ramos's voluntarily signing the consent form was sufficiently an act of free will to purge the taint of the preceding illegal detention. Therefore, the evidence discovered by the consented-to search was not made inadmissible by the Fourth Amendment. The District Court did not err in denying the motion to suppress. The judgment is

Affirmed.

BEAM, Circuit Judge, concurring specially.

I concur in the result reached by the court. It is consistent with my dissent in the origi-

nal panel opinion. 20 F.3d 348, 353 (8th Cir.1994). I write separately to express my continuing disagreement with the court's conclusion that a Fourth Amendment violation occurred at any time during this stop and search.

First, the officer's contraband inquiry was permissible as part of the legitimate traffic stop. The officer's questions did not expand the detention beyond the limits of *United States v. Cummins* and *United States v. Barahona.* I reject the court's hypertechnical parsing of the subject matter of the questions to reach a contrary result.

Second, the officer's discussion of guns and drugs was permissible as a prelude to the officer's request for permission to search the vehicle. A request to search need not consist of a single, isolated statement. The officer's interest in contraband was a part of this request, a request which the court now recognizes as valid.

Third, even assuming that the officer's queries regarding contraband exceeded the scope of the traffic stop, the inquiry was permissible under *Terry v. Ohio.* I agree with the district court's conclusion that on the evidence adduced at the suppression hearing, the officer had a sufficient, objective basis to question Salvador Ramos about matters beyond the scope of the traffic stop.

The court makes much of the point that each act and each answer of the Ramoses, when viewed in isolation, could be deemed "consistent with innocent behavior." *Supra* at 1163. This court pointed out, however, in our recent en banc opinion in *United States v. Bloomfield,* 40 F.3d 910, 918 (8th Cir.1994), that "[w]e assess the factors on which an officer base[s] his claim of reasonable suspicion as a totality and in light of the officer's experience." As we said, " '[A] series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together.' " *Id.* at 918 (quoting *United States v. Weaver,* 966 F.2d 391, 394 (8th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992)). That was clearly the situation here.

Thus, there was no Fourth Amendment violation. I would affirm on that basis.